[Cite as *Helton v. U.S. Restoration & Remodeling, Inc.*, 2016-Ohio-1232.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Manitou Helton, | : | |
| Plaintiff-Appellant, | : | No. 14AP-899 |
| | | (C.P.C. No. 11CV-12873) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| U.S. Restoration & Remodeling, Inc. c/o Joshua Kanode, SA et al., | : | |
| | : | |
| Defendants-Appellees. | : | |
| | : | |

---

## D E C I S I O N

### Rendered on March 24, 2016

---

**On brief:** *Kevin O'Brien & Associates Co., L.P.A.*, *Kevin J. O'Brien*, and *Jeffrey A. Catri*, for appellant. **Argued:** *Kevin J. O'Brien*.

**On brief:** *Tyack, Blackmore, Liston & Nigh Co.*, *L.P.A.*, *James P. Tyack*, and *Ryan L. Thomas*, for appellees. **Argued:** *James P. Tyack*.

---

APPEAL from the Franklin County Court of Common Pleas

BROWN, J.

{¶ 1} This is an appeal by plaintiff-appellant, Manitou Helton, from a judgment of the Franklin County Court of Common Pleas overruling his objections to a magistrate's decision and adopting the magistrate's decision finding appellant was entitled to judgment in the amount of $600 against defendant-appellee, U.S. Restoration and Remodeling, Inc. ("U.S. Restoration"), and further granting judgment in favor of

defendant-appellee, Daniel L. Sechriest ("Sechriest"), on appellant's claims against him individually.

{¶ 2} On October 14, 2011, appellant and his wife, Christy Helton, filed a complaint, naming as defendants U.S. Restoration, Sechriest, Joshua Kanode, and Karen T. Chumley. The complaint, which alleged that appellant and his wife had contracted with U.S. Restoration for goods and services related to appellant's roof, set forth causes of action for fraud, slander of title, and violations of the Home Solicitation Sales Act ("HSSA") as well as the Ohio Consumer Sales Practices Act ("CSPA"). On November 21, 2011, appellees filed an answer and counterclaim. In the counterclaim, appellees alleged causes of action for breach of contract, unjust enrichment, and quantum meruit.

{¶ 3} On December 2, 2011, appellant and his wife filed a petition for Chapter 13 Bankruptcy in the United States Bankruptcy Court, Southern District of Ohio. The trial court subsequently issued an order to stay the case. On October 16, 2012, the trial court reactivated the case.

{¶ 4} On March 15, 2013, appellees filed a motion for partial summary judgment, which appellant opposed by memorandum contra. By decision and entry filed July 19, 2013, the trial court granted in part and denied in part appellees' motion for partial summary judgment, and dismissed from the case Christy, as well as defendants Kanode and Chumley.

{¶ 5} The trial court referred the matter to a magistrate for a bench trial on the claims. On July 24, 2013, appellees filed a motion in limine to exclude certain evidence, including evidence as to any settlements or agreed consent judgments involving Mastergard, Inc. ("Mastergard"), Sechriest and/or U.S. Restoration, and any investigations or consumer complaints filed with the office of the Ohio Attorney General ("attorney general"). On July 30, 2013, the attorney general filed objections to, and a motion to quash, a subpoena served by appellant on the custodian of records for the attorney general. Prior to trial, the magistrate ruled that evidence as to an agreed consent judgment entered between the attorney general and Mastergard in 2010 was not relevant to the instant proceedings.

{¶ 6} The matter came for trial before the magistrate beginning July 31, 2013. The following background facts are drawn from the magistrate's findings of fact as well as the record of proceedings. Appellant and his wife reside in a home located at 1779 Rivermont Road, Columbus; appellant purchased the home in 2002 for $81,000. U.S. Restoration is a corporation owned by Sechriest. Following a hail storm in April 2010, U.S. Restoration contacted homeowners in appellant's neighborhood to determine whether they had suffered hail damage to their roofs.

{¶ 7} On May 8, 2010, appellant met with Andrew Turner, an independent contractor who worked for U.S. Restoration; the parties scheduled the meeting to discuss the possibility of installing a new roof on appellant's residence due to storm damage. According to appellant, Turner "believed that they could give me a free roof and my insurance would pay the entire amount." (Tr. Vol. II, 45.) During the meeting, appellant and Turner discussed and agreed to a document, referred to as the "insurance allowance agreement," which both Turner and appellant signed. (Tr. Vol. II, 56.) The insurance allowance agreement provided for U.S. Restoration to assist the homeowner with the insurance claim; the final contract price was to be the final price agreed to between the homeowner's insurance company and U.S. Restoration, "at no cost to the homeowner." Under the terms, U.S. Restoration agreed to install dimensional shingles on the roof. The parties left blank a space on the document for designation of a shingle color.

{¶ 8} Appellant testified that he was "very adamant" during discussions with Turner that he wanted shingles in the "desert tan" color because the existing shingles were that same color, and the new shingles would match the siding; further, appellant believed this color was widely available, and that obtaining replacement shingles would be easy. (Tr. Vol. II, 46.) Appellant testified that Turner indicated U.S. Restoration would be able to obtain shingles in that color.

{¶ 9} During that meeting, appellant and Turner contacted appellant's insurer, American Family Insurance ("American Family" or "insurer"), to discuss opening a claim and initiating the process of obtaining the insurer's approval for the work. Appellant stated that the "main goal was for [Turner] to get with my insurance company to make sure that we could get funding." (Tr. Vol. II, 50.) Appellant's insurer scheduled a date and time for an adjustor to come to appellant's residence and inspect the roof.

{¶ 10}  Appellant testified that Turner did not discuss with him the right to cancel the agreement, nor did Turner provide him with written notice of a right to cancel during the meeting on May 8.  At trial, appellant identified "Exhibit E" as a written notice of right to cancel form containing his signature dated May 8, 2010.  Appellant denied having seen exhibit E prior to his deposition; he acknowledged, however, that his signature was on the exhibit document.  The notice of right to cancel provided that appellant had three business days to cancel the transaction, and that he could exercise the right by sending notice by May 12, 2010.  Turner testified that it was his practice to explain the notice of right to cancel form with the customer, and to provide the customer with two copies of the document.  The magistrate deemed Turner's testimony more credible on this issue, and concluded that appellant received oral notice of the right to cancel as well as two copies of the notice of cancellation form.

{¶ 11} According to appellant's testimony, Turner represented that the company would complete the work within two weeks; appellant acknowledged, however, that he was aware insurance approval would take time.  During his testimony, Turner stated that he would not have made such a promise because U.S. Restoration could not perform any work until the insurer gave approval.

{¶ 12} Turner met with an insurance adjustor at appellant's residence several days after the May 8 meeting, and the adjustor conducted an inspection of the roof; according to Turner, the roof had significant damage from the recent hail storm, as well as older damage.  Appellant testified that Turner showed him areas on the roof that appeared to be pitted and damaged, and appellant believed the roof was damaged.

{¶ 13} The adjustor submitted a recommendation to American Family, and the insurance company authorized payment in the amount of $6,678.70 toward replacement of the roof.  On May 16, 2010, American Family issued the first of two checks to appellant for the roof work; the first check was in the amount of $2,108.84.  On June 10, 2010, Turner went to appellant's residence, and appellant and his wife both signed the check over to U.S. Restoration.

{¶ 14} On July 20, 2010, Turner called U.S. Restoration to inquire as to the time frame for the roof work; he spoke with Chumley, the company's office manager.  Chumley subsequently phoned appellant and informed him that the insurer had not agreed to pay

for upgrades to comply with current building codes, including new sheathing and snow/ice shields. Chumley also told appellant that U.S. Restoration was unable to obtain desert tan shingles.

{¶ 15} Following his conversation with Chumley, appellant spoke with his insurer who informed him that the policy did cover building code upgrades. Appellant contacted Sechriest with that information and, during this conversation, Sechriest informed appellant that U.S. Restoration was having difficulty obtaining desert tan shingles. According to appellant, Sechriest assured him they would "look into it and they should be able to get what I need." (Tr. Vol. II, 86.) Appellant testified that Sechriest phoned him on July 30, 2010, and informed him that U.S. Restoration had acquired the desert tan shingles and would begin work the next day.

{¶ 16} Sechriest testified that U.S. Restoration attempted to obtain desert tan shingles and he identified exhibit K as his handwritten material order sheet. The supplier contacted Sechriest and reported they did not have desert tan in stock, but that they had a color "identical to desert tan." (Tr. Vol. III, 132.) Sechriest authorized the order and paid for it on July 24, 2010.

{¶ 17} On July 31, 2010, a subcontractor of U.S. Restoration performed the roofing work. That evening, appellant returned home from work and noticed that the roof cap was desert tan, but the rest of the roof was a darker color. Appellant phoned Sechriest, who then drove to appellant's residence to inspect the roof. Appellant told Sechriest that he was unhappy with the color.

{¶ 18} On August 20, 2010, American Family issued a second check to appellant in the amount of $4,569.86, but appellant made no further payment to U.S. Restoration at that time. On August 30, 2010, appellant met with Sechriest to discuss a resolution of the issues relating to the work. Appellant told Sechriest he was still not happy with the color; appellant also told Sechriest he had learned the insurer paid for re-roofing of the shed and a gutter downspout, but that this work was not completed.

{¶ 19} Both appellant and Sechriest testified that they agreed to a resolution of the issues. Specifically, because of appellant's dissatisfaction with the color, the parties agreed that appellant would receive a credit of $1,000 against the amount due and owing, i.e., appellant would pay $3,569.86 rather than the full amount of proceeds ($4,569.86)

from the second insurance check. The magistrate cited testimony by appellant acknowledging that he gave up on the issue of shingle color as part of the resolution.

{¶ 20} The parties also agreed that U.S. Restoration would replace the roof cap to match the shingles and would drop off shingles for the shed but would not perform the gutter and downspout work. Accordingly, appellant and Sechriest executed a written addendum, dated August 30, 2010, reflecting that U.S. Restoration would install only the roof cap, drop off 2.66 square feet of shingles for the shed, and also provide the roof cap for the shed. Appellant was obligated to pay for the project in full ($3,569.86) upon completion and delivery.

{¶ 21} Sechriest testified that U.S. Restoration replaced the roof cap and delivered the shingles for the shed on October 7, 2010. Appellant and Sechriest met on that date; during the meeting, appellant indicated he was still unhappy with the color of the roof cap, and he refused to make payment.

{¶ 22} According to Sechriest, the replacement roof cap and shingles were a closer match to the roof, but not a perfect match; Sechriest testified that the dimensional shingles have natural color variations as part of their design, making it difficult to find an exact color match. After this meeting with appellant, Sechriest contacted a number of suppliers in an effort to find shingles for the roof cap that were a closer match to the roof; Sechriest subsequently found what he believed to be the closest match possible.

{¶ 23} On December 29, 2010, appellant and Sechriest met again and negotiated another resolution of the dispute. Appellant had already cashed the second insurance check in the amount of $4,569.86, and the parties agreed that appellant would pay U.S. Restoration $2,000 at that time; appellant would then make three payments of $250 each on February 1, March 1, and April 1, 2011, respectively, reflecting an additional credit to appellant of $819.86 against the amount due under the August 30, 2010 addendum. Appellant gave Sechriest a check in the amount of $2,000 during the meeting on December 29, 2010. Sechriest testified that the parties agreed the balance owed under the August 30 addendum would be due if appellant failed to make the monthly payments. The parties further agreed that U.S. Restoration would deliver the shingles Sechriest had found for the roof cap, and that appellant would finish the work on the roof cap and the shed himself.

{¶ 24} On January 5, 2011, Sechriest placed a telephone order for delivery of the shingles for the roof cap. Sechriest stated that the cost of the shingles was $60, and the supplier's practice was to make deliveries the same or next day. Appellant testified that shingles were not delivered for the roof cap. Based on the evidence presented, the magistrate found that U.S. Restoration delivered the shingles for the shed to appellant, but that the evidence failed to establish delivery of the roof cap shingles.

{¶ 25} In late January 2011, appellant made a $250 payment by check to U.S. Restoration. On January 25, 2011, U.S. Restoration filed a mechanic's lien on appellant's residence in the amount of $1,870.24. Sechriest testified that the mechanic's lien should have been in the amount of $1,569.86 (instead of $1,870.24), reflecting the amount due under the December 29, 2010 agreement in the event appellant failed to make the three monthly payments.

{¶ 26} Upon receiving notice of the mechanic's lien, appellant became upset and did not make the two remaining monthly payments of $250 each. In December 2011, appellant and his spouse filed for bankruptcy; the mechanic's lien was subsequently removed during the bankruptcy proceedings.

{¶ 27} At trial, appellant stated he was still dissatisfied with the color of the shingles on the roof. He agreed that U.S. Restoration had performed "decent" work on the roof, and that there were no leaks. (Tr. Vol. II, 220.) He also agreed that the new roof was better than his former roof, that it included upgrades to comply with current building codes, and that he received upgraded shingles as compared to the old roof.

{¶ 28} The magistrate rendered a decision on September 12, 2013. With respect to appellant's first cause of action for alleged violations of HSSA, the magistrate ruled in favor of U.S. Restoration, finding that Turner provided appellant two copies of the three-day notice of cancellation form and orally informed him of the right to cancel as required by R.C. 1345.23.

{¶ 29} The magistrate next addressed appellant's second cause of action, alleging four violations of CSPA. The magistrate first determined that the evidence indicated U.S. Restoration violated Ohio Adm.Code 109:4-3-05(A) by failing to provide appellant with a form indicating the reasonably anticipated completion date and containing required disclosure language notifying him of the right to an estimate. The magistrate also found

that U.S. Restoration violated Ohio Adm.Code 109:4-3-05(B) by failing to orally inform appellant of the right to an estimate prior to commencement of work.   The magistrate found U.S. Restoration did not violate Ohio Adm.Code 109:4-3-05(D)(16), as the evidence failed to show that U.S. Restoration disclaimed any warranty of the repair or service performed by the subcontractor, or that appellant requested the identity of the subcontractor.   Finally, the magistrate determined that U.S. Restoration violated Ohio Adm.Code 109:4-3-05(D)(12) by failing to provide appellant with a written itemized list of repairs to be performed.

{¶ 30} The magistrate next considered appellant's claim that he had been left with a roof he did not want, and that he was entitled to recover damages in the amount of three times the cost to replace the roof.  The magistrate ruled that appellant, by entering into the addendum agreements on August 30 and December 29, 2010, "expressly, knowingly, and voluntarily waived any claim relating to the color of the shingles."  Specifically, the magistrate found that appellant, on August 30, 2010, "agreed to a resolution of the dispute regarding the color of the roof in which he received a credit of $1,000.00 against the amount due," and that appellant "expressly acknowledged in his testimony that he gave up on the color issue as part of this resolution"; further, the parties entered into the written addendum specifying the remaining work to be performed by U.S. Restoration "in exchange for the reduced price, which work did not include changing the color of the roof itself."

{¶ 31} The magistrate noted that the parties negotiated a second resolution of the dispute (on December 29, 2010) after U.S. Restoration changed the color of the roof cap and appellant expressed dissatisfaction with the color.   In exchange for an additional credit against the amount owed, the parties agreed that U.S. Restoration would deliver shingles for the roof cap and shed, and that appellant would finish the work himself.

{¶ 32} The magistrate held that, despite evidence of several CSPA violations, appellant failed to establish a proximate cause between those violations and the claimed damages (i.e., the cost of replacement of the roof); the magistrate therefore found appellant did not prove actual damages in connection with his CSPA claim.   The magistrate further determined that appellant's "dissatisfaction with the roof color has no relationship to his claims that [U.S. Restoration] failed to provide a written or oral

estimate or an itemized list of repairs." Based on the evidence presented, the magistrate concluded that appellant was entitled to recover statutory damages of $200 for each of the three CSPA violations, for a total award of $600.

{¶ 33} With respect to appellant's claim for personal liability against Sechriest, the magistrate held that the evidence failed to establish Sechriest "dealt directly with the consumer in, or directed, the activities found to be CSPA violations." The magistrate thus concluded that appellant's "right to recover for the CSPA violations is only against [U.S. Restoration]." The magistrate also denied appellant's request for an award of attorney fees under CSPA. Finally, the magistrate ruled that the evidence did not support appellant's claims for fraud and slander of title.

{¶ 34} Appellant filed seven objections to the magistrate's decision. By decision and entry filed October 31, 2014, the trial court overruled all of appellant's objections and adopted the magistrate's decision.

{¶ 35} On appeal, appellant sets forth the following seven assignments of error for this court's review:

> I. THE TRIAL COURT ERRED IN REFUSING TO PERMIT THE PLAINTIFF TO PRESENT EVIDENCE REGARDING DAN SECHRIEST'S PAST CONSUMER SALES PRACTICES ACT VIOLATIONS.
>
> II. THE TRIAL COURT ERRED IN REFUSING TO FIND THAT THE "INSURANCE ALLOWANCE AGREEMENT" IS NOT A CONTRACT.
>
> III. THE TRIAL COURT ERRED IN ONLY FINDING THREE CSPA VIOLATIONS WHEN MORE VIOLATIONS WERE APPARENT ON THE FACE OF THE INSURANCE ALLOWNCE AGREEMENT.
>
> IV. THE TRIAL COURT ERRED IN FINDING THAT HELTON WAIVED THE ISSUE OF THE COLOR OF THE SHINGLES AS PART OF THE ATTEMPTED ACCORD AND SATISFACTION OF AUGUST 30, 2010, AND DECEMBER 29, 2010.
>
> V. THE TRIAL COURT ERRED IN FAILING TO FIND THAT THE DEFENDANTS' CONDUCT IN FILING A LATE-FILED AND PERJURIOUS MECHANIC'S LIEN DOES NOT CONSTITUTE SLANDER OF TITLE.

VI. THE TRIAL COURT ERRED IN HOLDING THAT DAN SECHRIEST HAS NO PERSONAL LIABILITY IN THIS CASE.

VII. THE TRIAL COURT ERRED IN FAILING TO AWARD THE PLAINTIFF HIS ATTORNEY FEES.

{¶ 36} Under the first assignment of error, appellant contends the trial court erred in failing to permit him to introduce evidence with respect to an agreed consent judgment entry and order ("consent judgment") arising out of a 2007 action brought by the attorney general against Mastergard, a company formerly operated by Sechriest. According to appellant, the attorney general, in Franklin C.P. No. 07CV-9803, sought and secured a permanent injunction against Sechriest enjoining him from soliciting and engaging in consumer transactions in the home improvement business in the state until he met certain conditions. On August 9, 2010, the trial court in that action approved an agreed consent judgment which the attorney general and Mastergard proposed pursuant to R.C. 1345.07(F).

{¶ 37} Appellant argues that the consent judgment arising out of the 2007 action brought by the attorney general is critical to the issue of whether Sechriest knowingly made CSPA violations in the instant case. According to appellant, Sechriest is in "gross violation" of the consent judgment in case No. 07CV-9803.

{¶ 38} As noted under the facts, appellees filed a motion in limine on July 24, 2013, seeking to exclude evidence regarding any settlements or agreed consent judgments involving Mastergard, Sechriest, or U.S. Restoration, as well as any investigations by the attorney general. Prior to trial, the magistrate heard oral arguments on the motion, and the magistrate inquired of counsel for appellant as to the relevancy of the agreed consent judgment in case No. 07CV-9803. Counsel for appellant argued that the consent judgment in that case was relevant because "Sechriest is involved in the very same conduct * * * [h]e got busted for the first time," and "this goes to the issue of knowledge and whether he knows that his conduct violates [CSPA] and [HSSA]." (Tr. Vol. I, 6.) Counsel argued they were "not trying to submit this to show he's just generally a bad guy." (Tr. Vol. I, 6.) Rather, counsel argued, "we have to show * * * he is aware that the things he's doing now * * * are illegal." (Tr. Vol. I, 6.)

{¶ 39} The magistrate, in addressing counsel's argument, stated on the record: "The requirement of knowledge * * * relevant to the CSPA claim is whether the person knows of the activity. Not whether they know it[']s illegal. They're still bound by the law whether they know what the law is or not." (Tr. Vol. I, 8.) Thus, the magistrate observed, "whether they know it's illegal is not an issue * * * under the CSPA." (Tr. Vol. I, 8.)

{¶ 40} Counsel for appellant also argued that the consent judgment was relevant "to the issue of the punitive damages," asserting that "the conduct in this case is particularly egregious." (Tr. Vol. I, 8-9.) The magistrate, however, noting that "[y]our clients are not a party to that judgment," questioned "how would what happened in 2007 tell me whether punitive damages would be appropriate in this case?" (Tr. Vol. I, 9.) Following argument on the motion, the magistrate determined that appellant had made "no showing of the relevance of this consent judgment to the legal issues in this case." (Tr. Vol. I, 16.)

{¶ 41} In his objections to the magistrate's decision, appellant argued that the ruling of the magistrate denied him the right to present relevant, admissible evidence regarding past CSPA violations by Sechriest; according to appellant, the consent judgment was relevant because it established Sechriest had knowledge that his actions violated CSPA. The trial court overruled this objection, holding that the evidence appellant sought to present "was not direct evidence relating to this case." The court, noting that appellant had requested the magistrate to consider "outside matters relating to prior conduct" of appellees, concluded that appellant failed to demonstrate an abuse of discretion by the magistrate in declining to consider "such non-relevant testimony."

{¶ 42} In reviewing an appeal from a trial court's adoption of a magistrate's decision, "our role is to determine if the trial court abused its discretion in ruling on the objections and by adopting that decision as its own." *McCon v. Martini,* 7th Dist. No. 97 CA 152 (Nov. 10, 1999). Further, "a trial court has broad discretion in the admission or exclusion of evidence." *In re G.C.,* 8th Dist. No. 83994, 2004-Ohio-5607, ¶ 27. Thus, "so long as such discretion is exercised in line with the rules of procedure and evidence, its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice." *Id.*

{¶ 43} As noted, the magistrate rejected appellant's argument that the agreed consent judgment was relevant to show Sechriest knew his conduct was in violation of CSPA. We agree. Under Ohio law, a defendant "need not know that his conduct violates [CSPA]." *Prince v. Campbell Roofing & Sheet Metal,* 2d Dist. No. 19007, 2002-Ohio-3809, ¶ 7. Rather, "the knowledge requirement concerns a defendant's knowing commission of an act, not knowledge that his act is contrary to law." *Id.,* citing *Einhorn v. Ford Motor Co.,* 48 Ohio St.3d 27, 30 (1990).

{¶ 44} As also noted by the magistrate, appellant was not a party to the earlier consent judgment between the attorney general and Mastergard. Evid.R. 401 defines the term "relevant evidence" to mean "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Here, the trial court could have reasonably determined that evidence concerning the 2007 action, resulting in a consent judgment between the attorney general and Mastergard (both non-parties to the instant proceeding), was not relevant to the issue of punitive damages or the claims against U.S. Restoration in the present case. On review, we find no error by the trial court in its determination that the magistrate's exclusion of the evidence at issue was proper.

{¶ 45} Accordingly, appellant's first assignment of error is without merit and is overruled.

{¶ 46} Appellant's second and fourth assignments of error are interrelated and will be considered together. Under the second assignment of error, appellant contends the trial court erred in failing to find, as a matter of law, that the insurance allowance agreement was not a contract; under his fourth assignment of error, appellant asserts the trial court erred in finding that he waived the issue as to the color of the shingles as part of an accord and satisfaction.

{¶ 47} In his objections to the magistrate's decision, appellant argued that the insurance allowance agreement lacked key provisions of a binding contract, including a price term. Appellant also asserted the agreement was unenforceable because it was dependent on a third party (i.e., the insurance company) authorizing payment of the claim, and amounted to merely an agreement to agree. The trial court overruled appellant's objection, finding that it "belies the conduct of the parties to the agreement."

The court noted that the insurance company "agreed that the roof replacement was necessary and * * * agreed * * * it would pay to replace it for the benefit of its insured."

{¶ 48} Under Ohio law, "[a] contract is generally defined as a promise, or a set of promises, actionable upon breach," and the essential elements of a contract include "an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and of consideration." *Kostelnik v. Helper,* 96 Ohio St.3d 1, 3 (2001). Thus, "[a] meeting of the minds as to the essential terms of the contract is a requirement to enforcing the contract." *Id.* at 3-4.

{¶ 49} In general, "[a] contract price must be definite and certain." *Preston v. First Bank of Marietta,* 16 Ohio App.3d 4, 6 (4th Dist.1983). However, "[a]lthough a contract must be definite as to price, it is just as well established that parties may make a binding contract where the price is not stated exactly." *Id.* In addition, "the law may impose a presumption of reasonableness or 'fair value' when services are performed pursuant to an express contract that does not specify a price." *Ameritech Publishing, Inc. v. Snyder Tire Wintersville, Inc.,* 7th Dist. No. 09 JE 35, 2010-Ohio-4868, ¶ 32.

{¶ 50} As noted under the facts, appellant and Turner met on May 8, 2010, at which time they discussed the possibility of U.S. Restoration installing a new roof due to hail storm damage. According to appellant, Turner "believed that they could give me a free roof and my insurance would pay the entire amount." (Tr. Vol. II, 45.) During that meeting, appellant and Turner both signed the "insurance allowance agreement," which provided for U.S. Restoration to assist the homeowner with the insurance claim. Under the terms, U.S. Restoration agreed to install dimensional shingles on the roof, with the contract price to be the final price agreed on between the homeowner's insurance company and U.S. Restoration, "at no cost to the homeowner."

{¶ 51} Here, appellant testified that Turner represented U.S. Restoration would install a new roof with zero out-of-pocket cost to him. Appellant further acknowledged that an adjuster, acting on behalf of his insurer (American Family), met with Turner at the residence to assess the roof damage; appellant subsequently learned that American Family agreed to cover the hail damage claim, and appellant received two checks from his insurer for a total amount of $6,678.70. On June 10, 2010, appellant and his wife signed

over the first check in the amount of $2,108.84 to U.S. Restoration.  On July 31, 2010, a subcontractor of U.S. Restoration installed a new roof, and appellant acknowledged the roofers did a "decent" job of roofing the house.  (Tr. Vol. II, 220.)

{¶ 52} Appellant's claim that the agreement was indefinite for lack of a specific price term is not persuasive.  Under Ohio law, "[a]n offer is not indefinite if the agreed price, though not specifically stated, is easily ascertainable by reference to some extrinsic standard."  *Preston* at 6*, citing 1 Williston on Contracts (3 Ed.1957) 153, Section 47.  *See also Natl. Wholisticenter v. George E. Wilson Co.,* 9th Dist. No. 20928, 2002-Ohio-5039, ¶ 19, quoting *Bailey v. Mills,* 5th Dist. No. 1999 AP 07 0043 (Feb. 7, 2001) (" 'If the price is not specified in the contract, it must be easily ascertainable by reference to some extrinsic standard.' ").

{¶ 53} The terms of the agreement at issue prescribe a method for ascertaining the price based on an extrinsic standard, i.e., the parties agreed to be bound to a price term reflecting the amount agreed on by the insurance company and U.S. Restoration, with the provision that U.S. Restoration would perform such repairs at no cost to appellant.  The fact that the parties tied the determination of price to a third party (i.e., the insurance company) does not render the agreement indefinite.  *See, e.g.*, *Cobble Hill Nursing Home, Inc. v. Henry & Warren Corp.,* 74 N.Y.2d 475, 483 (1989) (agreement manifesting the parties' unmistakable intent that sales price for nursing home was to be fixed by a third person provided "an objective standard without the need for further expressions by the parties").  *See also* E. Allan Farnsworth, Contracts, Section 3.28, 198 (1982) ("provisions delegating to a third party the power to fix a term – usually price – have generally been held to meet the requirement of definiteness").  Accordingly, the price term in this case was "certain enough to constitute an enforceable contract."  *Ameritech Publishing* at ¶ 33.

{¶ 54} We also find no merit to appellant's contention that the agreement was unenforceable because there were no assurances the insurer would pay.  Appellant points to language in the agreement that U.S. Restoration reserved, "[f]or a period of 10 days after all periods of rescission have expired," the right to cancel the agreement in the event the insurer did not authorize necessary funds.  However, when a contract as a whole is supported by consideration, "a reservation of the right to cancel the contract on notice does not make the contract unenforceable because the party reserving the right to cancel

is bound to perform unless and until such notice is given." *Driscoll v. Norprop, Inc.*, 129 Ohio App.3d 757, 764 (8th Dist.1998). *See also Spacek v. Maritime Assn.,* 134 F.3d 283, 297 (5th Cir.1998), quoting Corbin on Contracts, Section 164 (1963) ("if a party reserves the right to terminate upon a certain period of notice to the other party, the reserving party's promise is not rendered illusory because 'the party in whom the power has been reserved has made a real promise, one that in terms purports to control his action during the specified period of notice' "); *Azad v. MRCO, Inc.*, Tex.App. No. 14-12-00165-CV (Nov. 7, 2013) (rejecting argument that contract could not exist between property owner and contractor until insurer made a coverage determination where the insurance authorization form was not subject to further negotiations between property owner and contractor, and the form capped the sum to be paid by property owner for repairs at an amount not to exceed the amount finalized with the insurance company).

{¶ 55} As also noted by the trial court, and outlined under the facts above, appellant's challenge as to the certainty of the terms overlooks the parties' course of conduct. Specifically, after the parties signed the agreement, U.S. Restoration obtained approval for the repairs, and the insurance company issued its first check to appellant in May 2010. Appellant and his wife endorsed that check to U.S. Restoration, and the company replaced the roof on July 31, 2010. The issue of "[w]hether the parties intended to be bound * * * is a question of fact properly resolved by the trier of fact." *Oglebay Norton Co. v. Armco,* 52 Ohio St.3d 232, 235 (1990). In the present case, the record supports the trial court's determination that the parties' course of conduct belies appellant's claim there was no contract.

{¶ 56} Further, the record supports the magistrate's determination that appellant waived, through accord and satisfaction, any claim relating to the color of shingle by entering into the August 30 and December 29, 2010 agreements with U.S. Restoration. In general, an accord is "a contract between a debtor and a creditor where the claim is settled for a sum other than the amount allegedly due." *Coburn v. Auto-Owners Ins. Co.,* 189 Ohio App.3d 322, 2010-Ohio-3327, ¶ 26 (10th Dist.). The elements necessary to have an accord and satisfaction are " 'proper subject matter, competent parties, mutual assent, and consideration.' " *Id.,* quoting *State ex rel. Shady Acres Nursing Home, Inc. v. Rhodes,* 7 Ohio St.3d 7, 8 (1983). Under this doctrine, "[s]atisfaction takes place when the creditor

accepts the accord." *Stan Gertz & Assoc., Inc. v. Donald K. Gant Realty,* 9th Dist. No. 14805 (June 12, 1991). Accordingly, "[a]n accord and satisfaction 'cannot be consummated unless the creditor accepts the lesser amount with the intention that it constitutes settlement of the claim.' " *Coburn* at ¶ 26, quoting *Shady Acres* at 8.

{¶ 57} The record in this case indicates that, after workers for U.S. Restoration completed the roofing work on July 31, 2010, appellant expressed his dissatisfaction to Sechriest regarding the shingle color. Appellant testified that Sechriest came to his residence on August 30, 2010, and they "discussed an actual resolve," and "signed an addendum to the agreement" on that date. (Tr. Vol. II, 103.) During that meeting, appellant again "expressed to him my disliking of the roof, the color." (Tr. Vol. II, 107.) Appellant testified that he signed the addendum reflecting that U.S. Restoration would "bring over the shed shingles, * * * they would bring over the cap that would at least match the wrong color that was on my roof and * * * then they would take less." (Tr. Vol. II, 113.) According to appellant, "they quoted it as about a thousand dollars they allowed to me." (Tr. Vol. II, 113.)

{¶ 58} Regarding the addendum, Sechriest testified that appellant was "displeased still with the roofing shingle color," and that "[w]e tried to make an amends with him, a discount, and we came up with $1,000 as a figure." (Tr. Vol. III, 138.) Sechriest stated that he also agreed to install a new roof cap and provide shingles for appellant's shed.

{¶ 59} The terms of the addendum provided that U.S. Restoration would "install only the [roof] cap," provide the homeowner with "2.66 square of shingles" for the shed, as well as provide a cap for the shed. The addendum further provided: "The homeowner will pay $3,569.86 upon completion [and] delivery. The project will be paid in full at that time." During cross-examination, appellant was asked whether he was "willing to give up [U.S. Restoration] changing the color to desert tan for you as a part of this resolution?" Appellant responded: "Yes." (Tr. Vol. III, 14.)

{¶ 60} Sechriest testified that the new roof cap was installed in October 2010; according to Sechriest, the color of the shingles for the new roof cap "was better looking than the first one, but it wasn't exactly a perfect match" because of the "shading of the dimensional shingle." (Tr. Vol. III, 143.)

{¶ 61} After U.S. Restoration changed the color of the roof cap, appellant was still not pleased with the color of the shingles, leading to further negotiations between appellant and Sechriest on December 29, 2010. Specifically, Sechriest testified that he placed calls with suppliers in an attempt to "track down an exact match cap." (Tr. Vol. III, 144.) Sechriest was able to obtain some bundles of "Sunrise Cedar" three-tab shingles. (Tr. Vol. III, 144.) Sechriest learned that those cap shingles would be available in December.

{¶ 62} Sechriest spoke with appellant on December 29, 2010, at which time Sechriest learned that appellant had cashed the second insurance check and "didn't have all the money that he used to have." (Tr. Vol. III, 146.) Sechriest testified that "we were offered $2,000. And it came about that he could make another * * * three payments of $250, but he couldn't make it right away. He'd have to wait until the first of February and then March and then April." (Tr. Vol. III, 146-47.) Sechriest then made an agreement with appellant to accept a check for $2,000 at that time, and if appellant made three subsequent payments of $250 each "we would waive the balance that he still owed after that only if we received those payments." (Tr. Vol. III, 148.) Thus, U.S. Restoration agreed to give appellant an additional credit of $819 as part of the resolution. According to Sechriest, appellant understood that if he failed to make those subsequent payments "the full balance would be owed." (Tr. Vol. III, 148.) Sechriest testified that he ordered the cap shingles on January 5, 2011.

{¶ 63} Appellant testified that "we negotiated down again to a different dollar amount. I was going [to] give them a $2,000 check that day on December 29 of 2010 and then I was going to make payments up to $750, which totals 250 each payment." (Tr. Vol. II, 133.) Appellant acknowledged that he was to make equal payments of $250 each in "February, March and April." (Tr. Vol. II, 133.) Appellant mailed the first $250 payment at the end of January. Appellant refused to make the remaining payments after learning that U.S. Restoration had placed a mechanic's lien on his property.

{¶ 64} Based on the evidence presented, the magistrate concluded that appellant expressly, knowingly, and voluntarily waived any claim relating to the color of the shingles. In overruling appellant's objection, the trial court found that the evidence was clear that appellant agreed to accept a compromise to resolve the color issue. On review

of the record, there was competent, credible evidence supporting the trial court's determination that the parties compromised as to the issue of the color of shingles by entering into the addendums on August 30 and December 29, 2010, under which appellant agreed to credits of $1,000 and $819.86, respectively, in order to resolve the impasse. Accordingly, the trial court did not err in overruling appellant's objection on this issue.

{¶ 65} Based on the foregoing, appellant's second and fourth assignments of error are without merit and are overruled.

{¶ 66} Under his third assignment of error, appellant argues the trial court erred in finding only three CSPA violations. According to appellant, the insurance allowance agreement contains various CSPA violations "apparent on the face" of the agreement, including the failure to set forth: (1) a start and completion date; (2) the number of layers of shingles to be torn off; (3) the name of the manufacturer supplying the shingles; (4) the color of shingle; and (5) the number of ridge vents to be replaced. Appellant asserts further CSPA violations because the document at issue contains blank spaces, and the cancellation notice is not in 10-point, bold-face type. Appellant also notes that the agreement lists the duration of the manufacturer's limited warranty as "30 years," but he argues that the evidence indicates no warranty was provided to him. Finally, appellant argues that the request by appellees in their counterclaim for attorney fees constituted a violation of the Fair Debt Collection Practices Act ("FDCPA").

{¶ 67} As noted by appellees, appellant did not raise many of the above issues in his objections before the trial court. Pursuant to Civ.R. 53(D)(3)(b)(iv), "[e]xcept for a claim of plain error, a party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law under Civ.R. 53(D)(3)(a)(ii), unless the party has objected to that finding or conclusion as required by Civ.R. 53(D)(3)(b)." *See also State ex rel. Muhammad v. State,* 133 Ohio St.3d 508, 2012-Ohio-4767, ¶ 3 (party waives argument on appeal if that party failed to specifically raise issue in objections to magistrate's decision). Accordingly, we confine our review to those issues appellant raised in his objections to the trial court from the magistrate's decision.

{¶ 68} In his objections to the magistrate's decision, appellant argued that appellees' use of the insurance allowance agreement violated CSPA because: (1) the agreement failed to include all material statements in a written contract; (2) the agreement signed by the consumer contained blank spaces; and (3) appellees failed to provide a 30-year warranty despite language to the contrary. Appellant also filed a supplemental objection, in which he argued that appellees had violated FDCPA by requesting, in their counterclaim, an award of attorney fees.

{¶ 69} In addressing these objections, the trial court, noting that the magistrate found "technical violations [of CSPA] and awarded $600.00 in statutory damages," found that appellant presented "no evidence for this Court to alter the determinations of the Magistrate." The court concluded that appellant "agreed to compromise his claims for $1,000.00" and, "[h]aving so agreed, * * * is limited to the statutory damages mandated by the CSPA."

{¶ 70} Although appellant contends that various CSPA violations are apparent on the face of the insurance allowance agreement, his essential argument is that the trial court's failure to find these alleged violations was against the manifest weight of the evidence. In this respect, judgments supported by some competent, credible evidence, going to all the essential elements of the case will not be reversed as being against the manifest weight of the evidence. *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶ 71} The Supreme Court of Ohio has observed that "[t]he Consumer Sales Practices Act, R.C. Chapter 1345, prohibits suppliers from committing either unfair or deceptive consumer sales practices or unconscionable acts or practices as catalogued in R.C. 1345.02 and 1345.03." *Johnson v. Microsoft Corp.,* 106 Ohio St.3d 278, 2005-Ohio-4985, ¶ 24. CSPA "[i]n general * * * defines 'unfair or deceptive consumer sales practices' as those that mislead consumers about the nature of the product they are receiving, while 'unconscionable acts or practices' relate to a supplier manipulating a consumer's understanding of the nature of the transaction at issue." *Id.*

{¶ 72} As noted above, appellant contends the trial court should have found a violation of CSPA for failure of the agreement to include all material terms. However, a supplier's failure to put all the material aspects of an agreement in writing does not

constitute a "per se violation of the CSPA." *Warren v. Denes Concrete, Inc.,* 9th Dist. No. 08CA009414, 2009-Ohio-2784, ¶ 12 (observing that "neither the CSPA nor the Ohio Administrative Code requires all suppliers, regardless of the circumstances, to place their entire agreement with a consumer in writing"). We note that this court has declined to adopt a strict liability standard for certain violations of CSPA. *Conley v. Lindsay Acura,* 123 Ohio App.3d 570, 575 (10th Dist.1997) (supplier's omission of express limitations did not amount to deceptive, unconscionable, or unfair conduct).

{¶ 73} Here, both the magistrate and trial court found that the parties had a meeting of the minds as to the essential terms of the insurance allowance agreement, as well as the subsequently negotiated addendums entered on August 30 and December 29, 2010. As discussed above, there was testimony by appellant indicating that he understood the parties' respective obligations under the agreement, including the obligation of U.S. Restoration to obtain approval from his insurer for the roof work, and his obligation to forward checks to U.S. Restoration to cover the cost of the roof replacement. The subsequent actions of the parties reflected that understanding, as the insurer approved the work, U.S. Restoration performed the work, and appellant signed over the first check to U.S. Restoration. As further discussed above, because of a dispute over the shingle color, the parties entered into the addendums, and appellant testified as to his understanding of his obligations under the terms of those agreements. On review, the trial court's determination that the parties agreed to the essential terms of the agreement was not against the manifest weight of the evidence, and the court did not err in failing to find a CSPA violation as to that issue.

{¶ 74} Appellant further argues that courts have found a violation of CSPA in cases in which a customer executed a contract containing blank spaces. In support, appellant cites *Eagle v. Fred Martin Motor Co.*, 157 Ohio App.3d 150, 2004-Ohio-829 (9th Dist.), a case dealing with an arbitration clause. We note that appellant does not contend there was evidence in the instant case that appellees filled in blank spaces on the agreement after he signed the document, and we find no error by the trial court in failing to find a per se violation of CSPA based on the facts presented.

{¶ 75} Appellant also contends the trial court erred in failing to find a CSPA violation under Ohio Adm.Code 109:4-3-05(D)(16). In his objections, appellant argued

that the insurance allowance agreement provided that the duration of the manufacturer's limited warranty was 30 years, but that there was testimony U.S. Restoration did not provide a warranty.

{¶ 76} Ohio Adm.Code 109:4-3-05 states in part:

> (D) In any consumer transaction involving the performance of any repair or service it shall be a deceptive act or practice for a supplier to:
>
> * * *
>
> (16) Fail to disclose to the consumer prior to the commencement of any repair or service, that any part of the repair or service will be performed by a person other than the supplier or the supplier's employees if the supplier disclaims any warranty of the repair or service performed by that person, the nature of the repair or service which that person will perform, and if requested by the consumer, the identity of that person.

{¶ 77} Appellant's contention that the trial court erred in failing to find a violation of Ohio Adm.Code 109:4-3-05(D)(16) is unpersuasive. Here, while the facts indicate subcontractors performed the work, the evidence, as found by the magistrate, did not show that U.S. Restoration disclaimed any warranty of the repair or service performed by the subcontractors, nor was there evidence that appellant requested the identity of the individuals performing the work.

{¶ 78} Appellant also argued in his supplemental memorandum in support of objections that appellees violated FDCPA by attempting to recover attorney fees on a consumer debt, and in seeking attorney fees in their counterclaim. In support, appellant cited two federal cases, *Gionis v. Javitch, Block & Rathbone,* 405 F.Supp.2d 856 (S.D.Ohio 2005), and *Foster v. D.B.S. Collection Agency,* 463 F.Supp.2d 783 (S.D.Ohio 2006), for the proposition that Ohio law does not permit creditors to request attorney fees in certain debt collection actions.

{¶ 79} The stated purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C.

1692(e). In accordance with those goals, "[t]he Act makes it unlawful for debt collectors to use abusive tactics while collecting debts for others," and "[i]t imposes civil liability only upon 'debt collectors' as defined by the Act." *Games v. Cavazos,* 737 F.Supp. 1368, 1382 (D.C.Del.1990).

{¶ 80} The term "debt collector" is defined to mean "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. 1692a(6). Thus, it has been held " 'the statute does not apply to persons or businesses collecting debts on their own behalf. * * * It is directed to those persons who are engaged in business for the principal purpose of collecting debts.' " *D.A.N. Joint Venture III, L.P. v. Armstrong,* 11th Dist. No. 2006-L-089, 2007-Ohio-898, ¶ 40, quoting *Staub v. Harris,* 626 F.2d 275, 277 (3d Cir.1980).

{¶ 81} Appellees argue that appellant never alleged necessary operative facts regarding claims under FDCPA in his pleadings, and further contend that he failed to present any evidence that U.S. Restoration and/or counsel for appellees qualify as "debt collectors" as defined under 15 U.S.C. 1692a(6). We agree. A review of the record supports appellees' contention that appellant failed to plead a valid claim for FDCPA violations, nor does the record show that appellant established at trial that either U.S. Restoration or counsel for appellees are debt collectors as defined under FDCPA.

{¶ 82} Based on the foregoing, appellant's third assignment of error is without merit and is overruled.

{¶ 83} Under his fifth assignment of error, appellant contends the trial court erred in failing to find U.S. Restoration committed slander of title by filing the mechanic's lien in January 2011. Appellant argues that the mechanic's lien filed by U.S. Restoration was untimely and for the wrong amount, and appellant maintains the trial court should have found the conduct of appellees was malicious or made with reckless disregard for its falsity.

{¶ 84} As noted by appellees, however, appellant did not raise the above objection before the trial court. Rather, while appellant's fourth cause of action alleged slander of title based on the filing of the mechanic's lien by U.S Restoration, his objection to the trial

court raised a different argument.  Specifically, under his objection, appellant argued that U.S. Restoration's conduct in filing the mechanic's lien constituted a violation of CSPA.

{¶ 85} The trial court addressed this new argument, noting that appellant "now contends that there were violations of the CSPA as a result of the late filing."  The court overruled appellant's objection, finding that testimony at trial "established that the lien with an incorrect amount was filed within the sixty (60) day window allowed by the CSPA."  The court thus concluded it could not find "any harm caused to Plaintiff by the filing of the Mechanic's Lien and adopts the findings and conclusion of the Magistrate."

{¶ 86} Because appellant's objection with respect to the filing of the mechanic's lien did not challenge the magistrate's determination that the evidence failed to establish U.S. Restoration committed slander of title by acting maliciously or recklessly in filing the lien, appellant has waived any claimed error as to that issue.  Appellant's fifth assignment of error is therefore overruled.

{¶ 87} Under his sixth assignment of error, appellant asserts the trial court erred in failing to find Sechriest personally liable under a traditional theory of piercing the corporate veil.  According to appellant, the evidence reflects that Sechriest dealt directly with him regarding the availability of the desert tan shingles, and appellant further maintains that Sechriest directed and controlled every aspect of U.S. Restoration's business.

{¶ 88} Under Ohio law, "[t]he general rule is that corporations are legal entities distinct from the natural persons who compose them; therefore, officers, directors, and shareholders are not normally liable for the debts of their corporations." *Stewart v. R.A. Eberts  Co.*, 4th Dist. No. 08CA10, 2009-Ohio-4418, ¶ 15, citing *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos.*, 67 Ohio St.3d 274, 287 (1993). Further, " '[b]ecause "[o]ne of the purposes of incorporation is to limit the liability of individual shareholders," the party seeking to have the corporate form disregarded bears the burden of proof.' " *Stewart* at ¶ 15, quoting *RCO Internatl. Corp. v. Clevenger,* 180 Ohio App.3d 211, 2008-Ohio-6823, ¶ 10 (10th Dist.), quoting *Univ. Circle Research Ctr. Corp. v. Galbreath Co.*, 106 Ohio App.3d 835, 840 (8th Dist.1995).

{¶ 89} In *Belvedere* at paragraph three of the syllabus, the Supreme Court set forth a three-pronged test for piercing the corporate veil, holding that the corporate form may

be disregarded and individual shareholders may be liable for wrongs committed by the corporation when:  "(1) control over the corporation by those to be held liable was so complete that the corporation has no separate mind, will, or existence of its own, (2) control over the corporation by those to be held liable was exercised in such a manner as to commit fraud or an illegal act against the person seeking to disregard the corporate entity, and (3) injury or unjust loss resulted to the plaintiff from such control and wrong." With respect to the second prong, this court has noted that "[w]hile the court in *Belvedere* employed the words 'fraud or illegal act,' Ohio courts, including this court, have held that the second prong is satisfied when 'unjust or inequitable' consequences occur." *Sanderson Farms, Inc. v. Gasbarro,* 10th Dist. No. 01AP-461, 2004-Ohio-1460, ¶ 38.

{¶ 90} In addressing appellant's claim that Sechriest should be held personally liable for CSPA violations, the magistrate determined that "[t]he evidence did not establish that Mr. Sechriest dealt directly with the consumer in, or directed, the activities found to be CSPA violations," and therefore appellant's right to recover for CSPA violations "is only against [U.S. Restoration]."  Further, in addressing appellant's third cause of action for fraud, the magistrate found that the evidence failed to establish Sechriest knowingly or recklessly made a false representation regarding the color of the shingles; rather, the magistrate found, Sechriest "attempted, unsuccessfully, to find the color of shingles Mr. Helton wanted."  Finally, the magistrate determined that appellant's fraud claim failed "for the additional reason that by entering into the August 30 and December 29, 2010 agreements, Mr. Helton expressly, knowingly, and voluntarily waived any claim relating to the color of the shingles in exchange for a credit against the amount owed."

{¶ 91} In his objections to the magistrate's decision, appellant argued, as he does on appeal, that Sechriest directed and controlled each aspect of U.S. Restoration's business, and that all of the elements for piercing the corporate veil were present.  The trial court overruled this objection, holding in part there was no evidence that Sechriest, through control over U.S. Restoration, intentionally attempted to deceive or harm appellant, and therefore appellant had not met his burden to demonstrate that Sechriest should be personally liable.

{¶ 92} Based on the record presented, we find no error with the trial court's failure to hold Sechriest personally liable under a traditional theory of piercing the corporate veil. As noted, the magistrate found no evidence that Sechriest dealt directly with the consumer with respect to the activities found to be CSPA violations, i.e., the activities of Turner in failing to provide an estimate, a written itemized list of repairs, etc. In this respect, courts have held that "[i]n order to hold a corporate officer personally liable for his actions in violation of [CSPA], the evidence must show the officer took part in the commission of the act, specifically directed the particular act to be done, or participated or cooperated therein." *Grayson v. Cadillac Builders,* 8th Dist. No. 68551 (Sept. 14, 1995).

{¶ 93} Further, in addressing appellant's objections, the trial court noted that the magistrate found three "technical" violations of CSPA by U.S. Restoration, including failure to disclose to appellant his right to receive an estimate, but determined there was no evidence Sechriest "intentionally attempted to deceive or harm" appellant. Rather, the trial court held, the agreement by U.S. Restoration "to compromise in this case demonstrates an effort to resolve the dispute for the benefit of all." On review, we find that the trial court's failure to find that Sechriest used his control over U.S. Restoration to commit an unjust or harmful act against appellant was not against the manifest weight of the evidence. Accordingly, the trial court did not err in failing to pierce the corporate veil.

{¶ 94} Appellant's sixth assignment of error is without merit and is overruled.

{¶ 95} Under his seventh assignment of error, appellant contends the trial court erred in failing to award attorney fees, arguing that the court should have awarded such fees on the basis that U.S. Restoration knowingly committed acts or practices in violation of CSPA. In support, appellant points to evidence regarding his dissatisfaction with the color of the shingles, and he again argues that Sechriest engaged in conduct he knew violated CSPA based on the 2010 consent judgment entered between the attorney general and Mastergard.

{¶ 96} R.C. 1345.09 states in part as follows:

> (F) The court may award to the prevailing party a reasonable attorney's fee limited to the work reasonably performed and limited pursuant to section 1345.092 of the Revised Code, if either of the following apply:
>
> * * *

(2) The supplier has knowingly committed an act or practice
that violates this chapter.

{¶ 97} Thus, pursuant to the provisions of R.C. 1345.09(F)(2), "a trial court may award a consumer reasonable attorney fees when the supplier in a consumer transaction intentionally committed an act or practice which is deceptive, unfair or unconscionable." *Einhorn* at syllabus. The Supreme Court has held that "the 'knowing' commission of an act that violates R.C. Chapter 1345 does not mandate imposition of attorney fees." *Charvat v. Ryan*, 116 Ohio St.3d 394, 2007-Ohio-6833, ¶ 27. Rather, "[t]he trial court has the discretion to determine whether attorney fees are warranted under the facts of each case." *Id.*

{¶ 98} In the present case, the magistrate cited the following reasons for declining to award attorney fees: (1) appellant's "only substantive complaint about the roofing work was his dissatisfaction with the color of the shingles, and he knowingly gave up this issue in exchange for a credit against the amount owed"; (2) the "only CSPA violations found did not proximately cause any actual damages" to appellant; (3) U.S. Restoration "did not intentionally deceive [appellant]"; and (4) U.S. Restoration "performed quality work, and Mr. Helton received value." In addressing appellant's objection to the magistrate's findings, the trial court, noting that the award of attorney fees under CSPA is discretionary, agreed with the magistrate's determination not to award attorney fees in this case.

{¶ 99} As noted, "[a]n award of attorney fees is discretionary, not mandatory," and this court's standard of review is an "abuse of discretion." *Hudson-Wobbecke Ents. v. Burwell,* 5th Dist. No. 06-CA-58, 2007-Ohio-1728, ¶ 58. We have previously addressed appellant's argument with respect to the relevancy of the 2007 action leading to the 2010 consent judgment, as well as appellant's claim that he did not give up on the issue of shingle color. On review of the decisions of the magistrate and trial court, we find no abuse of discretion by the trial court in declining to award attorney fees under the facts and circumstances of this case.

{¶ 100} Appellant's seventh assignment of error is without merit and is overruled.

{¶ 101} Based on the foregoing, the trial court did not err in overruling appellant's objections and adopting the decision of the magistrate. Accordingly, appellant's seven

assignments of error are overruled, and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.

*Judgment affirmed.*

KLATT and SADLER, JJ., concur.

_____